## STATE OF CONNECTICUT *v.* JUDSON BROWN
## (SC 16235)

Borden, Palmer, Sullivan, Vertefeuille and Leuba, Js.*

* The listing of justices reflects their seniority status on this court at the time of oral argument.

Argued January 17—officially released May 22, 2001

*Lisa J. Steele*, special public defender, for the appellant (defendant).

*Robert M. Spector*, deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*,

state's attorney, and *David P. Gold*, former supervisory assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, J. The principal issue of this appeal is whether there was a pattern of prosecutorial misconduct at trial that deprived the defendant of his constitutional right to a fair trial. Following a jury trial, the defendant, Judson Brown, was convicted of two counts of arson in the first degree in violation of General Statutes § 53a-111[1] and one count of conspiracy to commit arson in the first degree in violation of General Statutes §§ 53a-111 and 53a-48.[2] The trial court rendered judgment sentencing the defendant to a total effective term of twenty-five years imprisonment. The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1, and General Statutes § 51-199 (c).

On appeal, the defendant claims that he is entitled to a new trial because the state violated his state and federal constitutional rights to a fair trial by engaging in an egregious and pervasive pattern of prosecutorial misconduct designed to prejudice the jury against him. He also argues that the pattern of prosecutorial miscon-

---

[1] General Statutes § 53a-111 (a) provides in relevant part: "A person is guilty of arson in the first degree when, with intent to destroy or damage a building . . . he starts a fire or causes an explosion, and (1) the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied; or (2) any other person is injured, either directly or indirectly; or (3) such fire or explosion was caused for the purpose of collecting insurance proceeds for the resultant loss; or (4) at the scene of such fire or explosion a peace officer or firefighter is subjected to a substantial risk of bodily injury."

[2] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

duct that occurred during closing argument constituted plain error. We reject these claims and, consequently, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In 1992, Lucille Cribs purchased the house located at 670 Prospect Street, in New Haven, for $170,000 and financed it with a $138,000 mortgage. Throughout the negotiations, purchase and paperwork involved with buying the property, Cribs was assisted by the defendant.[3] Within one year, Cribs took out a second mortgage on the property in the amount of $24,137.39. In April, 1995, Cribs was notified that she had allowed the fire insurance to lapse; one of the mortgage requirements was that the property be insured in case of fire. The bank that held the first mortgage notified Cribs that it would purchase its own fire insurance on the property if she was unable to do so. The bank's insurance would not cover the contents of the house or any value of the house over the $138,000 owed to the bank on the first mortgage. Additionally, Cribs' bank loan had become seriously delinquent and the bank was about to commence a foreclosure action. At that time, Cribs did not purchase any insurance.

During this period, Cribs transferred the title of the property to JL Associates Corporation, of which the defendant was president. As president of the corporate owner of the property, the defendant arranged for it to be listed for sale and helped the broker by showing prospective buyers around the house. On January 30, 1996, the defendant quitclaimed the property back to Cribs.

On August 5, 1996, Cribs purchased homeowner's insurance on 670 Prospect Street that went into effect

---

[3] It is evident from both briefs that at various points in time, the defendant and Cribs were romantically involved. Although this is relevant to the fact that the defendant and Cribs were involved in each other's lives, it is not relevant to the underlying issues of this case.

immediately. Cribs insured the structure of the house for $267,500 and its contents for $200,625. Thus, the insurance covered the replacement cost of the house and its contents.

On August 18, 1996, at approximately 1:50 a.m., a fire broke out in a third floor storeroom of the house. Cribs and her children were not in the house at the time the fire began; they had left earlier in the evening to visit relatives in New Jersey.[4] The fire quickly spread and eventually turned into a "three alarm" fire, requiring three different response teams to be deployed.

The first firefighters arrived on the scene by 1:54 a.m. As the first firefighter entered the house through the front door, a burglar alarm sounded. The firefighters first searched for inhabitants throughout the house. One of the firefighters was injured. The fire ultimately was extinguished, leaving the house severely water damaged and uninhabitable.

After the fire was extinguished, the firefighter in command informed the battalion chief that an arson investigation was warranted because of the extreme density of the fire and the irregular burn pattern that the firefighter had observed in a closet or storeroom on the third floor of the house. The investigation first revealed that all of the doors except for the rear sliding door were locked and connected to the burglar alarm that had sounded when the first firefighter broke into the front door. In the backyard were Cribs' three guard dogs that were so fierce that the investigators could not enter the house through the rear.

In the storeroom on the third floor of the house, facing the backyard, the investigators discovered a "classic pour pattern," the pattern left on a hardwood

---

[1] At the time of the fire, Cribs was caring for her three biological children and for three foster children.

floor after an accelerant has been poured onto it. The accelerant naturally finds the crevices in the hardwood and burns deeper into the wood than a fire that is not driven by an accelerant. The investigators brought in an accelerant sniffing dog that led them to the storeroom on the third floor. Furthermore, the state forensics laboratory examined samples and determined that a "medium range petroleum distillate" was present in the floor of the storeroom.

Hours later, the investigators canvassed the neighborhood, asking if anyone had witnessed anything suspicious. One of the detectives spoke to Jiki Bruce, a nineteen year old resident of the residential group home for children located next door to Cribs' house. Bruce claimed that he had been awakened by the sounds of barking dogs and breaking glass; he then saw flames coming from the top floor of the house next door. He saw a person running along the side of the house toward a waiting black sports car; the person jumped into the passenger side of the car and the car sped away. Bruce identified this person as the defendant. Bruce later picked the defendant out of a photographic array. When shown a photograph of a black Mercedes Benz, Bruce identified it as the car that he had seen on Prospect Street the night of the fire and the car always driven by the defendant. At trial, however, Bruce recanted his identification of the defendant as the person whom he saw fleeing the scene.

Meanwhile, Cribs collected $412,000 from her insurance company for the damage caused by the fire. On October 10, 1996, the defendant was arrested.[5] He was charged with two counts of first degree arson in violation of § 53a-111 and one count of conspiracy to commit

[5] The defendant attempted to evade arrest. When the police arrived at his residence, other individuals told the officers that the defendant was not there; however, pursuant to their warrant, the police searched the house and found the defendant hiding behind the shower curtain in the bathtub.

first degree arson in violation of §§ 53a-111 and 53a-48. The defendant tried the case pro se, without standby counsel.[6] At trial, the jury found him guilty of all counts, and the trial court sentenced him to an effective term of twenty-five years. This appeal followed. Additional facts will be set forth as necessary.

The defendant raises four claims of prosecutorial misconduct. He argues that the sum of these claims established a pattern of misconduct that deprived him of a fair trial in violation of his due process rights under the state and federal constitutions.[7]

Specifically, the defendant claims that the state's attorney improperly: (1) conducted the voir dire; (2) criticized the defendant's pro se trial techniques in front of the jury; (3) appealed to the jurors' emotions; and (4) commented upon the defendant's failure to testify. He argues that these claims reveal a pattern of prosecutorial misconduct that constitutes plain error and requires that he be granted a new trial. For the reasons that follow, we reject each of the defendant's claims.

Our standard of review of prosecutorial misconduct is well established. "In determining whether the defen-

[6] Initially, the defendant claimed indigence and requested a public defender. An assistant public defender was assigned to represent him. Thereafter, the state filed a motion for judicial determination of the defendant's eligibility for the public defender, attesting that since 1996, the defendant had been the owner of several properties, namely, a nightclub, other businesses and an airplane, among other assets. The public defender moved to withdraw from the case. The trial court, *Fracasse, J.,* granted the motion and the public defender withdrew her appearance. The defendant does not challenge this ruling.

[7] Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

The defendant offers no adequate and independent analysis under the state constitution; therefore, we confine our analysis to the issues raised under the federal constitution.

dant was denied a fair trial we must view the prosecutor's comments in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Williams*, 204 Conn. 523, 538, 529 A.2d 653 (1987). "In examining the prosecutor's argument we must distinguish between those comments whose effects may be removed by appropriate instructions . . . and those which are flagrant and therefore deny the accused a fair trial." (Citation omitted; internal quotation marks omitted.) Id. The defendant bears the burden of proving that the prosecutor's statements were improper in that they were prejudicial and deprived him of a fair trial. Id. "In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) Id., 540.

## A

The defendant claims that the state improperly used the voir dire by asking questions that were designed to prejudice the jurors against him. He argues that the state "planted a seed . . . that even routine pleasantries were an attempt by [the defendant] to manipulate the jury."

"Both the federal and state constitutions guarantee to an accused the right to a public trial by an impartial jury. U.S. Const., amends. VI and XIV; Conn. Const., art. I, § 8. . . . Part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to

identify unqualified jurors. . . . In Connecticut, the right to question jurors individually is specifically guaranteed by our constitution.[8] . . . The purpose of the voir dire examination is twofold: first, to provide information upon which the trial court may decide which prospective jurors, if any, should be excused for cause; and second, to provide information to counsel which may aid them in the exercise of their right to peremptory challenge. . . . There are two sets of interests protected by the voir dire: (1) the interests of the parties, namely, the defendant and the state; and (2) the interests of the prospective jurors." *State* v. *Patterson*, 230 Conn. 385, 391–92, 645 A.2d 535 (1994), on appeal after remand, 236 Conn. 561, 674 A.2d 416 (1996).

The defendant claims that the state abused the voir dire process by asking "a few" venirepersons whether any "pleasant exchange" they had with the defendant would sway them to feel sympathy toward him and make them unable to be impartial. The defendant also takes exception to the prosecutor's asking several venirepersons whether the defendant's pro se status would affect their judgment by evoking sympathy for the defendant and whether they might treat him as an "underdog."

The state argues that these questions were not improper, but that they were appropriate questions to be asked during a voir dire. It claims that there was a possibility that some of the venirepersons might be unable to remain impartial to a pro se defendant, despite the instructions from the trial court. Furthermore, the state was concerned about the defendant's own inap-

[8] The constitution of Connecticut, article first, § 19, as amended by article four of the amendments, provides in relevant part: "The right of a trial by jury shall remain inviolate . . . . In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate."

propriate questions to the venirepersons and appropriately responded with its own questions. The state argues that the defendant made inappropriate comments such as "I am obviously pro se, which means I am not qualified. . . . I want you to treat me fairly"; "[w]ould you want me to judge you the same way— would you treat me the same way you want to be judge[d]?" "Great. Great. Great. . . . [Y]ou are the type of person that would judge me accordingly: innocent until proven guilty . . . ." It was in response to those sorts of comments, the state argues, that required the prosecutor to ask about any possible bias the venirepersons might feel toward the defendant. We agree with the state.

"Because the purpose of voir dire is to discover if there is any likelihood that some prejudice is in the juror's mind which will even subconsciously affect his [or her] decision of the case, the party who may be adversely affected should be permitted questions designed to uncover that prejudice. This is particularly true with reference to the defendant in a criminal case." (Internal quotation marks omitted.) *State* v. *Hodge*, 248 Conn. 207, 217, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999). It is evident that the defendant recognized the purpose of the voir dire and used the opportunity to his proper advantage: i.e., to uncover possible prejudices in the potential jurors. The state, of course, did so as well. The defendant was concerned about the jurors' reaction to his pro se status and rightfully questioned whether that would affect their view of the case. In response, the state rightfully questioned the jury as to the same subject. The jurors' sympathies reasonably could have been aroused by the defendant's urging them not to afford him any special privileges and not to feel sorry for him because of his pro se status. The state appropriately

explored the possible bias that these comments, and others, may have created.

The defendant concedes that this conduct, alone, is insufficient to overturn the jury's verdict. Furthermore, with one exception, the defendant failed to object to the questions and comments that he now claims constituted prosecutorial misconduct.[9] "We can see no reason to depart from our prior holding that the fact that counsel for the accused [the defendant] took no exception to the remarks of the State's Attorney, either at the time they were made or at the close of his argument, was a waiver of the right of the accused to now press this assignment of error." (Internal quotation marks omitted.) *State* v. *Lubesky*, 195 Conn. 475, 484, 488 A.2d 1239 (1985). Although the defendant now claims that he is entitled to prevail under the standard enunciated in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[10] we conclude to the contrary. As we have indicated, the state's conduct was appropriate.

## B

The defendant also claims that the state improperly criticized and manipulated the defendant's trial techniques and his pro se status in order to prejudice the jury. Specifically, the defendant argues that the state's

[9] The one time the defendant did object to these comments occurred when the prosecutor asked a venireperson whether the "exchanged pleasantries" he had exchanged with the defendant would affect his judgment. This was the fourth time the state had asked this question and the first time the defendant objected. The objection was overruled.

[10] Under *State* v. *Golding*, supra, 213 Conn. 239–40, "the defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the constitutional violation beyond a reasonable doubt." (Emphasis in original.)

comments regarding his cross-examinations were really improper attacks on the defendant and that the state took advantage of the defendant's pro se status and ignorance of the law. We disagree.

At the onset, we address the defendant's assertion that he was treated improperly as a result of his pro se status. The right to appear as one's own attorney is well settled in both our federal and state law. In *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279–80, 63 S. Ct. 236, 87 L. Ed. 268 (1942), the United States Supreme Court emphasized the constitutional significance of the right to self-representation. " 'The right to assistance of counsel and the correlative right to dispense with a lawyer's help are not legal formalisms. They rest on considerations that go to the substance of an accused's position before the law. . . . To deny an accused a choice of procedure in circumstances in which he, though a layman, is as capable as any lawyer of making an intelligent choice, is to impair the worth of great Constitutional safeguards by treating them as empty verbalisms. . . . When the administration of the criminal law . . . is hedged about as it is by the Constitutional safeguards for the protection of an accused, to deny him in the exercise of his free choice the right to dispense with some of these safeguards . . . is to imprison a man in his privileges and call it the Constitution.' " *Faretta* v. *California*, 422 U.S. 806, 815, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

Similarly, this court has asserted the inviolability of the right of self-representation. "The right to appear pro se exists to affirm the dignity and autonomy of the accused and to allow the presentation of what may, at least occasionally, be the accused's best possible defense. . . . It is also consistent with the ideal of due process as an expression of fundamental fairness. To force a lawyer on a defendant can only lead him to believe that the law contrives against him." (Citation

omitted; internal quotation marks omitted.) *State* v. *Webb*, 238 Conn. 389, 427, 680 A.2d 147 (1996).

Along with the right to represent oneself, however, is the responsibility to comply with the rules of court and the procedures established therein. "[I]n the exercise of his sixth amendment right [to defend himself] the accused, as required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. . . . *State* v. *Stange*, 212 Conn. 612, 625, 563 A.2d 681 (1989)." (Internal quotation marks omitted.) *State* v. *Lewis*, 245 Conn. 779, 800, 717 A.2d 1140 (1998). In other words, the pro se defendant is not treated significantly different from the opposition. "Although we allow pro se litigants some latitude, the right of self-representation provides no attendant license not to comply with relevant rules of procedural and substantive law." (Internal quotation marks omitted.) *State* v. *Vlasak*, 52 Conn. App. 310, 315, 726 A.2d 648, appeal dismissed, 252 Conn. 228, 746 A.2d 742 (2000).

The defendant claims that the prosecutor "attacked [the defendant] for vigorously cross-examining witnesses and for suggesting alternative origins for the fire." The state claims that it correctly asked the jury to examine the evidence that the defendant had presented, much of it through his cross-examination of witnesses. The state also claims that it properly suggested that the jury draw inferences from what they had heard. We agree with the state.

Specifically, the defendant complains about the assistant state's attorney's comments to the jury that the eyewitness, Bruce, was intimidated "by the very person that he identified," and that the defendant "came down hard . . . [on] every witness that testified here," referring to Bruce, Marge Eichler, who was a neighbor of

Cribs, and John Napierkowski, who was the residence supervisor of the group home located next door. The defendant also takes issue with the prosecutor's comments regarding the defendant's suggestions, during cross-examination of two witnesses, of alternative origins for the fire. The defendant claims that comments such as those were really the prosecutor's suggestion to the jury that the defendant's cross-examinations and suggested alternatives were "part of [the defendant's] cynical and sinister attempts to manipulate the jury."

We must keep in mind that, in addressing the jury, both sides "must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Robinson*, 227 Conn. 711, 746, 631 A.2d 288 (1993).

Accordingly, we have considered both the defendant's and the state's closing arguments. Our review of the trial transcript discloses no indication that the state took advantage of the defendant as a result of his self-representation or that the state engaged in any prosecutorial misconduct.

We conclude that there was no prosecutorial misconduct present in the prosecutor's comments regarding the defendant's cross-examinations. Instead of criticizing the defendant's trial techniques as a pro se defendant ignorant of the law, the state was appropriately questioning the evidence presented by means of the defendant's trial techniques. The assistant state's attorney was actually suggesting to the jury that the defendant's "underdog" status was inapplicable because the defendant was exhibiting skill as an advocate. The prosecutor referred to the defendant's "eloquence" and his "entirely orchestrated defense . . . ."

The prosecutor's comments regarding the one eyewitness, Bruce, were appropriate as possible explanations for Bruce's recantation, during direct examination, of his identification of the defendant. The assistant state's attorney argued that Bruce was intimidated into changing his testimony, and that Bruce originally had identified the defendant as the arsonist when questioned by the detectives investigating the case. "This is the information he gave that morning to [Detectives Joseph] Pettola and [New Haven Fire Department Inspector Frank] Dellamura while it was fresh and before he had any idea that by providing that information three years later he would end up here in court being cross-examined by the very person that he identified. . . . Imagine you are the one who is involved in identifying an arsonist and suddenly he shows up at your home to talk to you. . . . But, of course, by now, having been visited by the defendant, having been visited by the defendant's investigator . . . and by having to face the defendant in the . . . courtroom, is it any surprise that now he sits on the stand, he said 'I don't remember?' " By referring to the defendant's cross-examination of Bruce, the prosecutor was merely suggesting inferences the jury might draw. The prosecutor was properly and "simply ask[ing] the jury to perform its appropriate function of drawing inferences from the evidence in the case." *State* v. *Heredia*, 253 Conn. 543, 565, 754 A.2d 114 (2000).

Similarly, we find no merit to the defendant's claims that the prosecutor improperly commented upon his cross-examination of other witnesses, specifically Eichler and Napierkowski. The assistant state's attorney argued: "[T]he defendant cross-examined . . . Eichler as if she was a contrary witness who was in here with some ax to grind against the defendant. He came down hard against her . . . . I mean, the defendant laid into every witness that testified here." With regard to Napierkowski, the prosecutor commented:

"And how does he cross-examine [Napierkowski]? This is a guy who doesn't have any interest at all in this case and the defendant tried to suggest that one of [his] kids walked out and set this fire because the squirrel thing[11] didn't work. He said one moment that squirrels could have set the fire, now he's mentioned that one of [the supervisor's] kids could have broken out from there that night and set the fire. . . . The defendant is—he has attacked everybody. . . . The defendant is just throwing the kitchen sink out, hoping that something will stick." We consider the prosecutor's comments proper advocacy: addressing possible inferences the jury might consider. See *State* v. *Heredia,* supra, 253 Conn. 565.

"[P]rosecutorial misconduct of constitutional proportions may arise during the course of closing argument . . . . *State* v. *Somerville,* 214 Conn. 378, 393, 572 A.2d 944 (1990). [T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor. *Smith* v. *Phillips,* 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982). The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . *State* v. *Williams,* [supra, 204 Conn. 539]." (Internal quotation marks omitted.) *State* v. *Sivri,* 46 Conn. App. 578, 590–91, 700 A.2d 96, cert. denied, 243 Conn. 938, 702 A.2d 644 (1997). "[M]oreover . . . [*Golding*] review of such a claim is unavailable where the claimed misconduct was not blatantly egregious and merely consisted of isolated and brief episodes that did not reveal a pattern of conduct repeated throughout the trial. . . . *State* v. *Atkinson,* 235 Conn. 748, 769, 670 A.2d 276 (1996)." (Internal quotation marks omitted.) *State* v. *Correa,* 241 Conn. 322, 357, 696 A.2d

[11] The defendant had argued that it was possible that squirrels nesting in the walls of the house may have started the fire.

944 (1997). We conclude that the defendant's claims of prosecutorial misconduct regarding the prosecutor's comments upon the defendant's cross-examination are groundless. The state did not engage in any conduct impinging on the fairness of the defendant's trial. Accordingly, the defendant may not prevail on this unpreserved claim under *Golding*.

### C

The defendant also claims that the state improperly appealed to the jury's emotions. Specifically, the defendant claims that the state's reference to the dangers confronted by the firefighters and its argument that the jury should be "outraged" by Cribs' testimony were improper in that they appealed to the "emotions, passions, and prejudices" of the jury. The state argues that the comments cited are proper statements regarding both the credibility of the defendant and the substance of the evidence presented. We agree with the state.

The impropriety of counsel appealing to the jury's emotions is well established. "When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." *State* v. *Williams*, supra, 204 Conn. 546. This case, however, does not present us with such impropriety. Instead, we agree with the state that the prosecutor's comments were fair attacks on Cribs' credibility, appropriate references to evidence presented at trial, or were stated in direct response to issues raised by the defendant.

The defendant takes exception to the prosecutor's statement, "I submit to you, you should be outraged by the fact that [Cribs] suggested she got this insurance for the protection of the foster kids when, in fact, she left the foster kids unprotected since April of '95." As the state argues, this statement is a proper comment

regarding the evidence that had been presented concerning Cribs' insurance and the inferences that the evidence suggested. It also properly refers to the credibility of Cribs as a witness. It is undisputed that in April, 1995, Cribs received notification from the holder of her first mortgage, New Haven Savings Bank, that her fire insurance had lapsed and that until she secured new fire insurance, the bank would purchase its own. Cribs did not take out her own fire insurance until August 5, 1996. Thirteen days later, the fire destroyed Cribs' home. Cribs' testified on direct examination that she obtained the insurance in order to protect the foster children in her care. This reasonably may be viewed as disingenuous when the facts surrounding the insurance, such as the notification of its lapse and the subsequent date of its purchase, are highlighted. In sum, the foster children had been unprotected for at least sixteen months, from April, 1995, until August, 1996. The prosecutor was properly advocating that these facts might reveal important questions about Cribs' credibility.

The statement also fairly addressed the element of first degree arson with which the defendant was charged requiring proof that the defendant started the fire for the purpose of collecting insurance proceeds for the resultant loss. See General Statutes § 53a-111 (a) (3) ("[a] person is guilty of arson in the first degree when . . . he starts a fire . . . and (3) such fire . . . was caused for the purpose of collecting insurance proceeds for the resultant loss").

The defendant also takes issue with the state's reference to the firefighters: "These firemen are crawling on their hands and knees looking for children in the house and the two people that know there are no kids in there are the defendant . . . and Miss Cribs and yet these guys are on their hands and knees crawling to see if there is a kid in the dresser or under the bed." This statement was a reference to evidence already

presented that illustrated the dangers testified to earlier by the firefighters, and highlighted it as proof of the necessary element of the other first degree arson charge the defendant faced, namely, that the fire subjected the firefighters to a substantial risk of bodily injury. See General Statutes § 53a-111 (a) (4) ("[a] person is guilty of arson in the first degree when, with intent to destroy or damage a building . . . he starts a fire . . . and . . . (4) at the scene of such fire . . . a . . . firefighter is subjected to a substantial risk of bodily injury").

The defendant also claims that the following statement was improper: "People could have died in that house. Those firefighters on their hands and knees could have died in that house and then [the defendant's] able to call them names."[12] Again, the comment is a proper reference to the relation of the evidence to the applicable statutory requirement, i.e., that the defendant's fire put the firefighters into danger of substantial bodily injury. Furthermore, the phrase "he's able to call them names" is a direct response to the defendant's sarcasm toward one of the firefighters during his cross-examination and to the department as a whole during his closing argument.[13] "When a prosecutor's allegedly improper argument is in direct response to matters raised by defense counsel, the defendant has no grounds for complaint." (Internal quotation marks omitted.) *State* v. *Briley*, 55 Conn. App. 258, 263, 739 A.2d 293, cert. denied, 251 Conn. 927, 742 A.2d 363 (1999).

We must keep in mind, as we have stated earlier, that some latitude is necessary when assessing any closing argument. We recognize the particular nature of closing argument and the opportunity for zealous

[12] We note that this is the only comment made by the prosecutor during closing argument to which the defendant objected.

[13] The defendant sarcastically referred to the firefighter as a "hero" and, in closing, sarcastically mentioned "the pressure of the good work of the Fire Department Arson Squad."

advocacy that it offers. See *State* v. *Robinson*, supra, 227 Conn. 746. This does not mean to suggest that we will tolerate misconduct. The comments complained of by the defendant, however, are neither egregious nor do they appear as part of a pattern of prosecutorial misconduct. Indeed, they were not improper. "It does not follow . . . that every use of rhetorical language or device is improper. . . . The occasional use of rhetorical devices is simply fair argument. *United States* v. *Nersesian*, 824 F.2d 1294, 1328 (2d Cir.), cert. denied, 484 U.S. 958, 108 S. Ct. 357, 98 L. Ed. 2d 382 (1987)." (Citation omitted.) *State* v. *Chasse*, 51 Conn. App. 345, 366, 721 A.2d 1212 (1998), cert. denied, 247 Conn. 960, 723 A.2d 816 (1999). We conclude that the state's comments, taken within the context of the whole trial and examined in isolation as well, did not in any way infringe on the defendant's right to a fair trial.

### D

Finally, the defendant claims that, during closing argument, the prosecutor unfairly commented on the defendant's decision not to testify. The state claims that such comments were not made but, if they were, constituted a direct response to the defendant's own remarks regarding special treatment for him as a pro se defendant. The state argues further that such responsive comments would not cause the jury to speculate upon the defendant's failure to testify. We again agree with the state.

"It is well settled that comment by the prosecuting attorney . . . on the defendant's failure to testify is prohibited by the fifth amendment to the United States constitution.[14] *Griffin* v. *California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106, reh. denied, 381 U.S.

[14] The fifth amendment to the United States constitution provides in relevant part: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

957, 85 S. Ct. 1797, 14 L. Ed. 2d 730 (1965). . . . Our legislature has given statutory recognition to this right by virtue of its enactment of General Statutes § 54-84.[15] In determining whether a prosecutor's comments have encroached upon a defendant's right to remain silent, we ask: Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify? . . . Further, in applying this test, we must look to the context in which the statement was made in order to determine the manifest intention which prompted it and its natural and necessary impact upon the jury. . . . Finally, [w]e also recognize that the limits of legitimate argument and fair comment cannot be determined precisely by rule and line . . . ." (Internal quotation marks omitted.) *State* v. *Satchwell*, 244 Conn. 564, 570–71, 710 A.2d 1348 (1998); *State* v. *Haase*, 243 Conn. 324, 332–33, 702 A.2d 1187 (1997).

The comments cited by the defendant did not infringe on his constitutional right to remain silent. The defendant objects to the prosecutor's comment that the defendant is "dumb like a fox." The defendant also argues that the assistant state's attorney improperly suggested that the defendant had planned to test the rules of court and to elude prosecution. The defendant also takes exception to the prosecutor's comment that "[t]he defendant is just throwing the kitchen sink out, hoping that something will stick," and the defendant suggested that there were comments made that improp-

[15] General Statutes § 54-84 provides in relevant part: "(a) Any person on trial for crime . . . at his or her option may testify or refuse to testify upon such trial. The neglect or refusal of an accused party to testify shall not be commented upon by the court or prosecuting official, except as provided in subsection (b) of this section.

"(b) Unless the accused requests otherwise, the court shall instruct the jury that they may draw no unfavorable inferences from the accused's failure to testify. . . ."

erly referred to his decision not to testify and his misuse of his pro se status.

The defendant's argument regarding this subject is inadequately briefed. Although the standard for prosecutorial misconduct in this regard is set forth, the defendant fails to cite specific language as examples of his claims that the state improperly commented on the defendant's failure to testify or that the defendant was misusing his pro se status. There is also no analysis or authority presented to support these claims of misconduct. Therefore, we will not review these claims. See *State* v. *Prioleau*, 235 Conn. 274, 294–95, 664 A.2d 743 (1995).

Furthermore, although the comment that the defendant was "dumb like a fox" is properly cited, it is unclear how this statement could in any way be construed to refer to the defendant's constitutional right not to testify or his pro se status. At worst, it is an example of arguably unnecessary rhetorical flourish. We already have established that mere rhetoric does not rise to the level of prosecutorial misconduct. See *State* v. *Chasse*, supra, 51 Conn. App. 366.

The assistant state's attorney did comment upon the defendant's "orchestrat[ion]" of his defense, stating: "I submit to you that he is entirely—this entirely orchestrated defense and his decision to test the limits of every rule of court is part of his effort, just like hiding in the bathtub was, to elude capture and elude responsibility for setting this fire, for placing these firefighters at risk, for having those proceeds paid." Additionally, the assistant state's attorney commented that "[t]he defendant is just throwing the kitchen sink out, hoping that something will stick." Again, the defendant fails to articulate how those statements relate to his claim that the state improperly referred to his failure to testify, his pro se status , or, in fact, to any prosecutorial mis-

conduct. In the absence of any legal analysis, we decline to review these claims. See *State* v. *Prioleau*, supra, 235 Conn. 294–95.

The judgment is affirmed.

In this opinion the other justices concurred.