STATE OF CONNECTICUT *v.* JOHN DEARBORN
(AC 22645)

Schaller, DiPentima and Hennessy, Js.

---

Argued February 24—officially released May 4, 2004

*James B. Streeto*, assistant public defender, for the appellant (defendant).

*Susann E. Gill*, senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Howard S. Stein*, assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, John Dearborn, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4).[1] On appeal, the defendant claims that (1) the trial court improperly

---

[1] The defendant also was convicted under a part B information as a persistent felony offender.

admitted evidence of three other robberies, (2) the court improperly admitted physical evidence, (3) the state committed prosecutorial misconduct, thereby depriving him of a fair trial, and (4) the court improperly instructed the jury. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At 1 a.m. on December 6, 1999, the defendant entered an Exxon gasoline station and convenience store in Fairfield. He approached the overnight clerk, who was working alone, and shouted at the clerk, instructing him not to look or he would shoot. Despite that admonition, the clerk observed that the defendant was wearing gray sweatpants and a black sweatshirt. The defendant also wore a maroon mask and had a paper bag over his right hand. The defendant told the clerk to open the cash register and then to lie down on the floor. The defendant continued to point his right hand, which was still covered by a paper bag, at the clerk and took the money from the register with his left hand. The defendant fled from the store, and the clerk called the police.

While the robbery was taking place, Officer Christopher Rubis of the Fairfield police department was patrolling the area. He noticed the defendant, who was approximately twenty to twenty-five feet away from the store. As Rubis slowed his patrol car, the defendant increased his walking speed and then suddenly began to run away. Rubis chased him, but was unable to catch him. Shortly thereafter, Rubis noticed a red minivan parked in a Gulf gasoline station. The minivan was parked differently from the rest of the cars in the lot and, although all of the other cars had condensation on their windows, the minivan did not. After further investigation, Rubis learned that the defendant's wife was the primary user of the car. Further inquiries revealed that according to the Gulf station's manager,

the minivan did not belong at the station. Looking into the van, Rubis saw birth certificates belonging to the defendant's children. At approximately 4 a.m., the police went to the defendant's house where the defendant's wife met them. She informed them that the defendant was not at home.

The police also searched the area of the defendant's escape route. In a wooded area nearby, Rubis found a gray sweatshirt, a pair of black sweatpants and a brown paper bag. Forensic tests revealed that the sweatshirt contained head hair, some of which was similar to the defendant's head hair. None of the hair on the sweatpants was similar to the defendant's hair. The defendant later was arrested, charged and convicted. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant claims that the court improperly admitted evidence of other crimes he allegedly committed, specifically three other robberies. The court admitted the evidence as prior misconduct based on grounds of common scheme, intent and identity. The defendant contests the admission on each ground and argues that the evidence was not sufficiently probative.

The following additional facts are necessary for the resolution of the defendant's claim. Before trial, the state informed the defendant that it planned to introduce evidence of prior and subsequent misconduct. The state filed a motion in limine seeking to admit the evidence. The court held a hearing, and the state introduced evidence of three incidents of other crimes, specifically, robberies that had occurred in Shelton, Milford and Westport.

The Shelton robbery occurred on August 6, 1999, at a Subway sandwich store. The store was staffed by a

single clerk who was preparing to close the store. The door to the store was locked, but a second employee, who was not scheduled to work that evening, used her key to enter the store to pick up her paycheck. At approximately 10:30 p.m., the defendant ran toward the store, opened the door, which had not been relocked, and ran to the register, where the clerk was standing and talking to the second employee. The clerk observed that the defendant was wearing jeans and a flannel shirt. The defendant also wore a nylon stocking mask over his face. His left hand was empty, but a brown paper bag covered his right hand.

After entering the store, the defendant pointed his right hand, still covered by the bag, at the clerk standing near the register. The defendant told the clerk to open the register; when the clerk hesitated, the defendant turned toward the other employee and threatened to kill her. The clerk opened the register, the defendant reached over the counter and, with his left hand, grabbed money out of the drawer. The defendant then fled the store.

As the defendant ran out of the store and into the street, he ran in front of a woman who was driving an automobile. Their eyes met briefly, and the defendant continued to a red minivan that was parked across the street from the store. The defendant entered the minivan, drove onto the road and followed the woman's vehicle. The defendant tried to pass her, but traffic forced his vehicle back into her lane. As a result, he forced her car off the road. Shortly thereafter, the woman wrote down the registration plate number of the defendant's minivan. She later called the Shelton police.

The police investigated the minivan and discovered that it was registered to the defendant's father-in-law, who explained that he had given it to his daughter to use. The police went to the defendant's house where

they observed the van. As the police were observing the van, the defendant came out of the house and moved the van a short distance. The police arrested the defendant.[2] The woman whose vehicle had been forced off the road was taken to the defendant's house, where she identified the defendant and the minivan. After searching the defendant's house, the police found a flannel shirt, which was later identified by the store clerk and the employee as the one worn by the defendant.

The Westport robbery took place on December 4, 1999, at a Cumberland Farms convenience store. At approximately 11:30 p.m., a clerk was working alone in the store. The defendant entered the store wearing a sweatshirt, jeans and a mask that appeared to be a thick stocking mask. The defendant's left hand was empty, but his right hand was covered by a paper bag. He told the clerk to open the cash register and threatened the clerk; the clerk complied with the defendant's demand. The defendant reached into the register drawer with his left hand and took money. As soon as the defendant had the money, he left the store.

After the defendant left, the clerk called the police. The police responded with a canine unit, which followed the defendant's scent to a parking lot behind the store. While following the dog, the police recovered a shirtsleeve, a paper bag and a cash register clip. Forensic testing on the sleeve revealed hair that was microscopically similar to that of the defendant and a mixture of DNA that included his DNA.

The Milford robbery occurred on July 6, 2000, at a Foodmart in Milford. At 3:30 a.m., a clerk was working alone in the store when the defendant entered wearing a baseball cap and a blue mask. The defendant wore a paper bag over his right hand. He grabbed the clerk

---

[2] The jury was not informed of the disposition of any of the other incidents.

and, pointing his right hand at the clerk, dragged him to the cash register and ordered him to open it. The clerk opened the cash register, and the defendant took money with his left hand. The defendant then ran out of the store.

The clerk called the police, who responded with a canine unit. The police located a baseball cap, a shirt and a blue mask that appeared to be cut from a shirt-sleeve. DNA of the defendant, among others, was found on the sleeve and cap. In addition, each item contained hair similar to the defendant's hair. The investigation also revealed that a customer who was at the store at approximately 12:30 a.m., had observed a red minivan outside the store. The customer later identified the mini-van as similar to the minivan owned by the defendant's father-in-law.

After a hearing, the court ruled that the evidence was admissible to show the defendant's common plan or scheme, identity and intent. During the trial, the court gave the jury limiting instructions regarding the use of the evidence and also instructed the jury on that issue in its jury charge.

"The standard of review is clear. The admission of evidence of . . . uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Aggen*, 79 Conn. App. 263, 270–71, 829 A.2d 919 (2003). To be admissible under the Connecticut Code of Evidence, the uncharged misconduct must be relevant; Conn. Code Evid. § 4-1; to one of the exceptions; id., § 4-5 (b); to the general bar against uncharged misconduct. Id., § 4-5 (a); see also *State* v. *Aggen*, supra, 271. If

it is relevant to one of the exceptions, then its probative value; Conn. Code Evid. § 4-1; must be greater than its prejudicial effect. Id., § 4-3; see also *State* v. *Aggen*, supra, 271.

Section 4-5 (b) of the Connecticut Code of Evidence specifies that uncharged misconduct may be admissible to prove, inter alia, "intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." Evidence of identity consists of methods of committing crimes that are "sufficiently unique to warrant a reasonable inference that the person who performed one misdeed also did the other. . . . Much more is required than the fact that the offenses fall into the same class. The device used must be so unusual and distinctive as to be like a signature." (Citations omitted; internal quotation marks omitted.) *State* v. *Sierra*, 213 Conn. 422, 430, 568 A.2d 448 (1990).

The uncharged misconduct evidence was sufficiently distinctive to constitute a signature.[3] The evidence showed that the defendant used a paper bag to hide his right hand; used his left hand to take money from the registers; employed threats or actual violence to force employee compliance; employed a vehicle to get away from the scene, usually a red minivan;[4] covered his face with a mask; targeted small food or convenience stores; robbed the stores at night; waited until there

---

[3] Given the facts in this case and because the evidence was admissible as being relevant to identity, we need not address whether it was admissible as being relevant to common scheme or to intent. See *State* v. *Mandrell*, 199 Conn. 146, 151–53, 506 A.2d 100 (1986); see also *State* v. *Murrell*, 7 Conn. App. 75, 88, 507 A.2d 1033 (1986).

[4] Although the defendant was not seen getting into a vehicle in the Westport robbery, the police canine tracked the defendant's scent to a parking lot where the scent abruptly stopped, which generally occurs when the subject being tracked enters a vehicle. Similarly, in the Milford robbery, the defendant's red minivan was seen in the area shortly before the robbery.

were a small number of employees present in the stores, usually only one employee; and, in three of the four robberies, discarded his clothing near the scene of the robbery.

Most of the factors, taken alone, would not constitute a unique method or signature. We are mindful, however, of our Supreme Court's statement in *State* v. *Figueroa*, 235 Conn. 145, 164, 665 A.2d 63 (1995). "[T]he fact that some of the similarities between the offenses were legal or relatively common occurrences when standing alone does not . . . negate the uniqueness of the offenses when viewed as a whole. It is the distinctive combination of actions which forms the signature or modus operandi of the crime . . . and it is this criminal logo which justifies the inference that the individual who committed the first offense also committed the second. . . . The process of construing an inference of [i]dentity . . . consists usually in adding together a number of circumstances, each of which by itself might be a feature of many objects, but all of which together make it more probable that they coexist in a single object only. Each additional circumstance reduces the chances of there being more than one object so associated. The process thus corresponds accurately to the general principle of relevancy." (Citations omitted; internal quotation marks omitted.) Id. We view the characteristics of all the incidents in the aggregate, as we must, and they form a pattern that is relevant to the issue of identity. See *State* v. *Mandrell*, 199 Conn. 146, 151–52, 506 A.2d 100 (1986).

That evidence also was more probative than it was prejudicial. The probative value springs from the facts of the crime charged in this case. The defendant's face was covered and, moreover, the identification of the defendant came largely from circumstantial evidence. The evidence of the other robberies, committed in a similar manner, tended to corroborate the identity of

the defendant as the perpetrator of the charged offense. Regarding the prejudicial effect, the defendant argues that "[b]y presenting the evidence of three separate incidents, separated by a period of some months, the trial court enabled the prosecution to create the impression that the defendant was a one man crime wave in Fairfield County, the jurors' own neighborhood." The jury was instructed, however, both during and at the close of the trial as to the proper use of the misconduct evidence. "Any prejudice was reduced by the court's . . . limiting instructions to the jury." *State* v. *Aggen*, supra, 79 Conn. App. 273. Jurors are presumed to follow the court's instructions. *State* v. *Tucker*, 226 Conn. 618, 628, 629 A.2d 1067 (1993). The court did not abuse its discretion in admitting the evidence of uncharged misconduct.

## II

The defendant also claims that the court improperly admitted into evidence a sweatshirt sleeve found after the Milford robbery. The defendant argues that the state failed to lay an adequate foundation for the sleeve because, at trial, one of the state's witnesses did not give a clear description of the mask that had been cut from a shirt sleeve.

The following additional facts are necessary for the resolution of the defendant's claim. At trial, the clerk involved in the Milford robbery testified that the defendant wore a blue mask. After the defendant took the money, he left the store and discarded his mask. When the police arrived, they used a police canine to track the defendant. While tracking the defendant, they located a baseball cap where the clerk indicated that the defendant had dropped it. When the police recovered the cap, they found a blue sleeve underneath it. When asked what the mask looked like, the clerk testified that the mask had "holes in it so you could see his eyes." When

shown a photograph of the mask, the clerk was unable to identify it. The court admitted the sleeve over the defendant's objection.

The following day, the defendant renewed his objection. The state countered that the court could review the store's surveillance videotape of the robbery to determine whether the recovered sleeve matched that in the videotape. After watching the videotape, the court overruled the defendant's objection and stated that "[w]hile there may very well be some significant argument over whether the sleeve offered in the incident that took place in Milford, I believe on balance it goes to the weight rather than the admissibility of the item. . . . [N]umber one, [the item was] the same color, the color blue, which was indicated by [the clerk] and also appeared similar in color on the videotape. Number two, we can see on the videotape there's nothing materially inconsistent with the description of [the clerk]. While we can't see for sure whether the eyes are covered or not, it—a reasonable person could conclude that it was tied together in a bandana type style, which may or may not have covered the eyes, but which I think is a question of argument. While [the clerk] did respond that the eyes were cut out, I think, again, given the context in which all the questions were asked, I think that's a question of argument, and, of course, a hat and a sleeve were found in an area designated and pointed out by [the clerk] where he indicated that he saw the perpetrator taking off the mask as he was running away." The court overruled the defendant's objection.

We review the court's decision to admit evidence only to determine whether the court abused its discretion. See *State* v. *Corbin*, 260 Conn. 730, 736–37, 799 A.2d 1056 (2002). To establish a foundation for admission, "[a]n item offered as real evidence must be positively identified as the actual item in question. This can be done by establishing unique or distinguishable

configurations, marks, or other characteristics, or by satisfactory proof of the item's chain of custody from the time of the incident to the time of trial." (Internal quotation marks omitted.) *Federal Deposit Ins. Corp.* v. *Carabetta*, 55 Conn. App. 369, 373, 739 A.2d 301, cert. denied, 251 Conn. 927, 742 A.2d 362 (1999).

In the present case, the court had the opportunity to compare the challenged evidence with reference to the videotape of the robbery. The court also heard testimony from the clerk, who identified the color of the mask. Additionally, the court heard the testimony of the police officer, who indicated that the mask was found with the defendant's baseball cap in the area identified by the clerk as the location where the defendant had dropped the mask. Because the court has the discretion to judge the credibility of the witnesses, as well as the videotape evidence, we cannot say it abused its discretion in admitting the evidence.

### III

The defendant also claims that the state committed prosecutorial misconduct during its closing arguments, thereby depriving him of a fair trial. The defendant argues that the prosecutor improperly vouched for the credibility of witnesses and denigrated the role of defense counsel.

The following additional facts are necessary for the resolution of the defendant's claim. At the beginning of the state's closing arguments, the prosecutor stated that "what's important to keep in mind is that this is argument. This is not fact, this is not sworn testimony, this is not law, this is our opinions. Ultimately, what's important about this process right here is that anything that either I say to you or that [defense counsel] says to you during this phase is just that, it's our opinion, it's our argument to you. If we draw any reference whatsoever to any evidence presented in this case, what

we remember about this case is not as important as what you remember, individually and collectively as a group."

During the defendant's closing argument, defense counsel stated, with regard to the woman's identification of the defendant after the Shelton robbery, that "as for her identification [of] him being the man she saw, when she got to the scene late [during the] early morning hours, she had already been stroked by the police pretty good . . . . They picked her up, they took her here, they took her there. She gets to the scene . . . and what does she see? She sees a van there. She sees a lot of police, police cars." Defense counsel continued along that line by arguing that the woman's identification of the defendant took place under suggestive circumstances. At the end of the argument, defense counsel stated: "Just remember, don't get snowed by everything that was said and given to you. Focus on the Fairfield case, reasonable doubt in the Fairfield case. They have no case."

In rebuttal, the prosecutor began his argument by stating, " 'Don't get snowed.' 'Don't get snowed.' Why do I feel that I've just listened to [defense counsel's] closing, and it's the old shell game. Go out to the corner, and the shells are sliding around. See if you can follow the pea. Lift up and see if you've found the pea at the end. Is that what [defense counsel] is asking you to consider? That this is the old shell game? I've stood before you several times now. I've laid out a case for you. I have presented evidence to you. I have argued some of it. I'm going to argue it now, in terms of the evidence, in detail. If you believe this is the old shell game, then you should acquit the defendant. If you believe that the evidence supports the state's case, you should convict the defendant."

The prosecutor also commented on the testimony of Officer Rubis: "Talk about being in the right place at

the right time. Isn't that what we pay our law enforcement to do, be in the right place at the right time? The man is coming down [the] Post Road, and he sees a guy coming out of the store. He's already twenty, thirty feet from the door and he's approaching the Post Road area, and [the officer], based upon good police instincts, says, 'Something's wrong here.' No vehicle around, doesn't appear to have anything in his hand. He's kind of walking out toward the Post Road at this time of the night, and keep in mind, too, that the court took judicial notice of the fact that we're talking about Monday night—Monday morning. . . . And [the officer] says, I see him, obviously he sees me, because, what happens? The gait picks up, he turns into a run, [the officer], following good police instincts, starts to pursue . . . ." Speaking about Officer Rubis' reaction to the red minivan, the prosecutor later stated: "So, again, good police instinct, good police training, What does he do? He requests information on the registration."

The prosecutor also spoke about the testimony of two expert witnesses[5] he had presented, stating: "They're the children that we all wish we had. I mean, academic credentials, achievements, honors. I offered them to you as experts in their field. The court adopted their expertise." In addition, the prosecutor spoke about the statistical probabilities of the DNA evidence and stated: "This isn't coincidence, folks. This is evidence. This is exactly the evidence that [defense counsel] doesn't want you to consider. [Defense counsel] asked you a lot of questions. He asked you a lot of questions about, 'It could have been this? What do you think about that? Could have been this.' And then he said to you, 'But I'm not in the business of answering your questions.' That's my job. I'm in the business of answering

---

[5] The experts presented testimony regarding the DNA evidence and hair evidence.

your questions. I answer your questions through evidence. I answer your questions through law."

In addition, the prosecutor spoke about the woman who identified the defendant after the Shelton robbery. After discussing the evidence showing that the woman had observed the license plate of the minivan, the prosecutor stated: "She went home. She had that discussion with her husband. 'Don't get involved,' he said. She's not that type of person not to be involved. She makes herself involved. She gives [the police] the [license] plate." The prosecutor also stated that the woman must have had "keen observation" to notice some of the details about the minivan.

The defendant did not object to any of the statements by the prosecutor and now seeks review under the four familiar prongs of *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). Because the record is adequate for review and the defendant's claim implicates his right to a fair trial, we will review the claim.

Our review of prosecutorial misconduct claims under *Golding* "is not intended to provide an avenue for the tactical sandbagging of our trial courts, but rather, to address *gross* prosecutorial improprieties that *clearly* have deprived a criminal defendant of his right to a fair trial." (Emphasis added.) *State* v. *Ceballos*, 266 Conn. 364, 414–15, 832 A.2d 14 (2003). "The defendant bears the burden of proving that the prosecutor's statements were improper . . . ." *State* v. *Brown*, 256 Conn. 291, 298, 772 A.2d 1107, cert. denied, 534 U.S. 1068, 122 S. Ct. 670, 151 L. Ed. 2d 584 (2001). "In argument before the jury, counsel may comment upon facts properly in evidence and upon reasonable inferences drawn therefrom." *State* v. *Kinsey*, 173 Conn. 344, 348, 377 A.2d 1095 (1977). Prosecutors may not offer their opinions by vouching for the credibility or truthfulness of a witness. *State* v. *Payne*, 260 Conn. 446, 454, 797 A.2d 1088 (2002).

We do not assume that every statement made by the prosecutor was intended to have its most damaging meaning. See *Donnelly* v. *DeChristoforo*, 416 U.S. 637, 647, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974).

The defendant supports his claim with two distinct arguments: First, the prosecutor vouched for and bolstered the credibility of Officer Rubis, the woman who identified the defendant, and the experts; and second, the prosecutor denigrated the role of defense counsel by making the "shell game" comments.

## A

The prosecutor's statements about the "good" police work did not constitute improper vouching for the credibility of Officer Rubis. The defendant cites *State* v. *Mills*, 57 Conn. App. 202, 208, 748 A.2d 318, cert. denied, 253 Conn. 914, 915, 754 A.2d 163 (2000), for the proposition that a prosecutor may not offer an opinion on the quality of police work. *Mills* is distinguishable because the prosecutor's statements in *Mills* were much more forceful and had no true basis in the evidence. See id., 208 n.11. Notably, in *Mills*, the prosecutor stressed the fact that the police knew that the defendant had committed the crime, and defense counsel objected to the prosecutor's statement and made an oral motion for a mistrial. Id., 206 n.7, 208 n.11. Here, the challenged statements were not made in the context of assertions about how the police believed the defendant was guilty; rather, they suggested reasonable inferences that could be drawn from the evidence. When a man leaving a convenience store in the early hours of the morning starts to walk faster at the sight of a police officer and then flees, it can be argued to be good police work to investigate him. Similarly, if the police come upon a suspicious car in the area of a robbery, it may be good police work to check the registration. Prosecutorial statements asserting "good police work" have the

potential to influence the jury and should be used with prudence and restraint, but the prosecutor's arguments did not constitute misconduct in this case.

The prosecutor's comments regarding the woman who observed the defendant during the Shelton robbery were proper. The statement, regarding the woman, that "[s]he's not that type of person not to be involved," was a reasonable inference drawn from the evidence because the woman's husband had told her not to call the police, but she disregarded his opinion and called the police. She did, essentially, "get involved." Similarly, the prosecutor's statement that the woman had "keen observation" was based on the evidence. The statement came in the context of the prosecutor's summation of the woman's testimony regarding small details on the defendant's registration plate.

The prosecutor's comment that the experts were "the children that we all wish we had" was unnecessary and irrelevant. It does not rise to the level of misconduct, however, because the jury is "able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The state's attorney should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he is simply saying 'I submit to you that this is what the evidence shows,' or the like." *State* v. *Thompson*, 266 Conn. 440, 465–66, 832 A.2d 626 (2003). No reasonable juror would believe that this was more than a hyperbolic comment on the achievements and credentials of the experts presented, especially given the statements that followed.

*Thompson*'s reasoning also applies to the prosecutor's statement that "[t]his is exactly the evidence that

[defense counsel] doesn't want you to consider." A juror would be able to determine that the prosecutor's statement was simply a response to defense counsel's statements regarding "don't get snowed" and not an indication that the prosecutor believed that defense counsel was trying to fool the jurors. We are convinced that reasonable jurors are able to differentiate between lawyers' ripostes and actual evidence. Even if we considered that statement to be improper, moreover, it would not rise to the level of gross prosecutorial misconduct.

The prosecutor's statement that the court adopted the expertise of the state's experts is troubling. That statement is susceptible to more than one interpretation, but we do not automatically attribute the most damaging meaning to statements. See *Donnelly* v. *DeChristoforo*, supra, 416 U.S. 647. We need not decipher the meaning of that statement, however, because even if we assume arguendo that the prosecutor intended the worst meaning, it would not rise to the level of gross prosecutorial misconduct that we could say clearly deprived the defendant of a fair trial.

B

The prosecutor's comments about a "shell game" were not improper. The defendant simply misinterprets the trial transcript. The prosecutor was not referring to defense counsel in making the comments, but was referring to defense counsel's characterization of the state's case. We note further that the comment was in response to the defendant's instruction to the jury, "don't get snowed," which opened the door for the state's arguments. See *State* v. *Ceballos*, supra, 266 Conn. 405–406.

IV

The defendant finally claims that the court improperly instructed the jury regarding the meaning of reason-

able doubt. The defendant concedes, as he must, that the instructions he challenges were held proper by our Supreme Court in cases such as *State* v. *Velasco*, 253 Conn. 210, 246–49, 751 A.2d 800 (2000), and *State* v. *Griffin*, 253 Conn. 195, 205–10, 749 A.2d 1192 (2000). We are bound by that precedent.

The judgment is affirmed.

In this opinion the other judges concurred.