******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# STATE OF CONNECTICUT *v.* ROBERT C. SIMMONS
## (SC 20846)

Mullins, C. J., and D'Auria, Ecker, Alexander,
Dannehy and Bright, Js.

*Syllabus*

Convicted of murder, home invasion, and burglary in the first degree, the defendant appealed to this court. The defendant claimed, inter alia, that the evidence was insufficient to support his conviction and that the trial court had improperly declined to instruct the jury on his third-party culpability defense. *Held*:

The state presented sufficient evidence to satisfy its burden of establishing the defendant's guilt beyond a reasonable doubt, as it was reasonable and logical for the jury to infer that the defendant was the perpetrator of the crimes of which he was convicted on the basis of certain video surveillance footage and forensic evidence presented at trial, as well as certain contradictory statements that he had made during his interviews with the police.

Contrary to the defendant's assertion, it was of no consequence that the jury could have construed the evidence consistently with a casual visit to the victim's home, as he had claimed during one of his interviews with the police, because the jury was not barred from drawing those inferences consistent with guilt and was not required to draw only those inferences consistent with innocence.

The trial court did not abuse its discretion in declining to instruct the jury on the defendant's third-party culpability defense, which was premised on his argument that a certain DNA profile found on a bloody hammer found near the victim's body directly connected an unknown male to the crimes.

Although a bloody hammer found near the victim's body was the likely the murder weapon and therefore had a close and proximate relationship to the murder, the video surveillance footage, the results of the police investigation, and the quotidian nature of the hammer led this court to conclude that the totality of the evidence adduced at trial was insufficient to permit a reasonable juror to infer that a third party was responsible for the victim's murder.

There was no merit to the defendant's claim that certain of the prosecutor's remarks made during closing and rebuttal arguments were improper and deprived him of a fair trial.

With respect to the prosecutor's comments regarding DNA evidence found on the defendant's jeans and "in" the victim's fingernails, and a comment regarding the victim's fight or struggle with the defendant, the prosecutor did not mischaracterize the facts in evidence or encourage the jury to make

unreasonable factual inferences, as those comments were rooted in the evidence presented and the reasonable inferences that could be drawn therefrom.

With respect to the prosecutor's comment during rebuttal argument characterizing defense counsel's theory of the case as "deceptive," the prosecutor did not disparage defense counsel personally or his institutional role in the proceedings but, rather, criticized defense counsel's theory of the case on the ground that it was "deficient," "dismissive," and "deceptive" because it did not account for the evidence of the defendant's guilt, particularly the video surveillance footage and DNA evidence, and the prosecutor's comment was in direct response to defense counsel's closing argument, in which he described the state's case as "deficient, dismissive, [and] deceptive" in the first instance.

Argued May 12—officially released July 22, 2025

*Procedural History*

Information charging the defendant with the crimes of murder, home invasion, felony murder, and burglary in the first degree, brought to the Superior Court in the judicial district of Stamford-Norwalk and tried to the jury before *White, J.*; verdict of guilty; thereafter, the court, *White, J.*, vacated the conviction of felony murder and rendered judgment of conviction of murder, home invasion, and burglary in the first degree, from which the defendant appealed to this court. *Affirmed.*

*Jennifer B. Smith*, assistant public defender, with whom, on the brief, were *Taryn Henderson* and *Kaylyn Terry*, law student interns, for the appellant (defendant).

*Nathan J. Buchok*, assistant state's attorney, with whom were *Elizabeth K. Moran*, assistant state's attorney, and, on the brief, *Paul J. Ferencek*, state's attorney, and *Michelle Manning*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

ECKER, J. On the evening of September 25, 2019, the ninety-three year old victim, Isabella Mehner, was robbed and bludgeoned to death in her own home. The police investigation led to the arrest of the defendant,

Robert C. Simmons, who was tried and convicted of the crimes of murder, home invasion, and burglary in the first degree. In this direct appeal,[1] the defendant claims that (1) the evidence was insufficient to support his conviction, (2) the trial court improperly declined his request to instruct the jury on third-party culpability, and (3) the prosecutor committed multiple improprieties during closing and rebuttal arguments, which deprived him of his due process right to a fair trial. We affirm the judgment of conviction.

The jury reasonably could have found the following facts. The victim lived by herself in a single-family residence located at the corner of Willowbrook Avenue and Cove Road in Stamford. On September 25, 2019, the victim spoke to her cousin on the telephone at about 3:30 p.m. She was later seen in her garden at 5:15 p.m. By 6 p.m., however, the victim's daughter, Ellen Blanchard, was unable to reach her by telephone. After repeated calls went unanswered, Blanchard decided to visit the victim to check on her well-being. Blanchard arrived at the victim's house at 8 p.m., where she was met by her brother and his wife. As they approached the victim's house via the back door on Willowbrook Avenue, Blanchard was surprised to see that the screen door was unlocked and that the back door was standing wide open—the victim normally kept those doors closed and locked. Blanchard, her brother, and her sister-in-law entered the unlocked house and searched for the victim, eventually finding her lying in a pool of blood at the bottom of the basement stairs.

Blanchard's brother called 911, and the police arrived soon thereafter. Emergency medical responders found the victim cold to the touch and unresponsive. Attempts to resuscitate the victim were unsuccessful, and she was pronounced dead at the scene at 8:22 p.m.

---

[1] See General Statutes § 51-199 (b) (3).

The police immediately suspected that the victim's death was not an accident. The amount of blood at the bottom of the stairs and the nature and extent of the victim's injuries appeared to be inconsistent with an accidental fall, and the unlocked screen door and open back door were unusual given the victim's habit of keeping those doors closed and locked. Moreover, the victim's wallet, which normally contained cash and was stored in her purse, was found empty and covered in blood at the bottom of the basement stairs near her body. The police also determined that the victim's wedding rings, which she always wore on her left hand, were missing and that her left hand was severely wounded. Lastly, the lid to the jewelry box in the victim's bedroom was left open, which was unusual, although no jewelry appeared to be missing.

An autopsy confirmed that the victim's death was a homicide. According to the medical examiner, the victim suffered multiple focal impact injuries to the head, many of which were curvilinear in nature, consistent with those that would be caused by the hammer found near the victim's body.[2] Additionally, there were abrasion injuries on her neck, bruising on her legs, and a deep laceration on her left hand.

The police investigated possible avenues of entry and exit from the victim's home other than the unlocked, open back door. They discovered that there was another door, the front door facing Cove Road, but that door was closed, locked, and showed no signs of forced entry. All of the windows also were closed and locked,

---

[2] On direct examination, Jacqueline Nunez, the medical examiner who performed the victim's autopsy, testified that the curvilinear injuries to the victim's skull were "consistent with being struck with a hammer multiple times . . . ." On recross examination, Nunez clarified that she could not "say with 100 percent certainty" that the hammer was the murder weapon, but it was her opinion "to a reasonable degree of medical certainty [that the] hammer caused these injuries . . . ."

except for one broken window in the basement covered in an undisturbed layer of dust and cobwebs. The police inspected the perimeter of the residence, looking for footprints in the dirt, scuff marks, or trampled grass outside of the windows. They found no signs of disturbance.

Video surveillance footage was acquired from surrounding homes and businesses. One business located across the street from the victim's house, Chelsea Piers, had a camera pointed directly at the intersection of Willowbrook Avenue and Cove Road with a clear view of the premises. The Chelsea Piers video depicts only one person entering the victim's house between 2:30 and 8 p.m. on the day of the victim's murder: an older Black man wearing a dark colored hat, a dark sweatshirt, and baggy jeans. The man initially can be seen walking past the victim's house on Willowbrook Avenue and glancing briefly up her driveway. The man walks out of sight but then returns approximately one minute later, striding up Willowbrook Avenue to the victim's house. He enters the house via the back door at 5:39 p.m., remains inside for eight minutes, and exits the back door at 5:47 p.m. The man then walks up Willowbrook Avenue, turns left onto Cove Road, and walks out of sight.

The police were able to track the man's progress up Cove Road through additional video surveillance footage. The man walked to a mini-mart located at 138 Cove Road, where he bought a beverage. The mini-mart video reveals further details regarding the man's appearance: he had a graying beard, a black bracelet on his left wrist, black shoes, and baggy, cuffed jeans with a distinctive design on the back pockets. The police patrolled the area looking for a suspect matching this description.

On September 27, 2019, Sergeant Christian DiCarlo of the Stamford Police Department saw a man fitting the

suspect's description at the intersection of Woodland Avenue and South Pacific Street in Stamford. Like the suspect, the man was an older Black man with a greying beard and was wearing a black hat, a dark colored shirt, a black bracelet on his left wrist, and baggy, cuffed jeans with a distinctive design on the back pockets. DiCarlo asked the man for identification and learned that he was the defendant. Because DiCarlo wanted to seize the defendant's clothing for forensic testing, he asked the defendant to accompany him to the police station. The defendant complied.

At the police station, the defendant's clothing and shoes were seized, and he was provided with a Tyvek suit and booties. The defendant waived his *Miranda*[3] rights and agreed to answer DiCarlo's questions. During the interview, the defendant denied knowing the victim or being in the area of Cove Road on September 25, 2019. The defendant told the police that he was homeless and had spent the day of the murder on the west side of Stamford at the train station and the soup kitchen. The defendant voluntarily provided a DNA sample at the end of the interview.

The police continued their investigation, learning that the defendant had been employed intermittently for three or four years by the victim's grandson-in-law, Richard Sachs. Sachs was the owner of a sewer and drain business, and he and the defendant had visited the victim's house five or six times together to fix the sink and main sewer drain in the victim's basement. The defendant left Sachs' employ approximately six months before the burglary, home invasion, and murder. The day after the victim's death, Sachs texted the

---

[3] Miranda v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); see id., 444 (prior to custodial interrogation, suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed").

defendant a link to a news article about the crimes, asked him if he knew anything about the incident, and offered to pay the defendant money to relay any information that he might learn about the victim's murder from people on the street.

The defendant returned to the police station on October 2, 2019. He again waived his *Miranda* rights and consented to a police interview. During his second interview, the defendant admitted that he was on Cove Road on September 25, 2019, and that he knew the victim. The defendant said he knocked on some doors because Sachs had asked him to get information but denied going into anyone's house or killing anyone. When DiCarlo pointed out that Sachs had asked the defendant to seek out information the day after the victim's murder, not the day of the victim's murder, the defendant steadfastly maintained that he never went inside the victim's house or killed anyone.

In the meantime, the police submitted various items collected from the victim's home for forensic testing. Four items found near the victim's body that appeared to be stained with blood were tested: a wallet, a hammer, a heavy ceramic jar, and a mop handle with a flattened end. The wallet, ceramic jar, and mop handle were tested for fingerprints, but no fingerprints were found. The hammer was not tested for fingerprints because DiCarlo was informed that the surface would not yield any identifiable prints. The four items also were tested for DNA. It was determined that the victim's blood was present on all four items, but no other DNA was found on the ceramic jar or mop handle. The wallet contained a second DNA profile in addition to that of the victim, but there was insufficient data to include or exclude the defendant as a contributor.[4] A male DNA

---

[4] A result is inconclusive if the "likelihood ratio" that the DNA belongs to a known individual rather than an unknown individual is between one and 10,000.

profile was found on a portion of the handle of the hammer that was not stained with blood, but this profile did not belong to the defendant. The jewelry box in the victim's bedroom also was subject to forensic testing, and there were three different DNA profiles present, one of which was that of a male, but the defendant was excluded as a contributor.

The defendant's clothing and the victim's fingernails were submitted for forensic testing, as well. Four small, reddish brown stains were found on the defendant's jeans, each of which tested positive for the presence of blood via an initial screening test. Two of those stains were submitted for subsequent DNA testing, and both contained the victim's DNA.[5] With respect to the victim's fingernails, male DNA was found, but there was insufficient data to generate an individualized DNA profile. A "Yfiler" test was performed, which is a specialized DNA test that isolates the Y chromosome in a male DNA sample. The results of the Yfiler test revealed that the DNA from the victim's fingernails was consistent with that of the defendant.[6]

On November 20, 2019, the defendant was interviewed for a third time after waiving his *Miranda* rights. During his third interview, the defendant admitted that he was on Cove Road on the day of the victim's murder, that he knew the victim, that he knocked on the victim's door, and that he went inside the victim's home. According to the defendant, he went to the victim's home because he hoped that she would give him some money. The defendant explained that the victim invited

---

[5] Lana Ramos, a forensic science examiner at the state forensic laboratory, testified that the "likelihood ratio" was 100 billion, meaning that it was 100 billion times more likely that the DNA originated from the victim than from an unknown individual.

[6] The likelihood that the male DNA belonged to the defendant or someone in his paternal lineage was 1 out of 230, which is less than 1 percent of the male population.

him inside and that, after exchanging pleasantries, he went downstairs to the basement to ensure that the sink and sewer line were draining properly. In return, the victim gave him $11. After thanking the victim, the defendant left the house, walked to the mini-mart on Cove Road, and purchased a beer and a cigarette. The defendant was adamant that he was in the victim's home for less than ten minutes and that the victim was alive and well when he left.

The defendant was arrested and charged with felony murder, murder, home invasion, and burglary in the first degree. A jury found the defendant guilty of all charges, but the trial court vacated the felony murder conviction on double jeopardy grounds. The trial court rendered a judgment of conviction on the remaining charges and sentenced the defendant to a total effective sentence of eighty-five years of imprisonment. This appeal followed.

I

We first address whether the evidence was sufficient to support a reasonable inference that the defendant committed the crimes of which he was convicted. The defendant acknowledges that there was abundant evidence placing him at the scene of the crimes at the approximate time of their commission but argues that this evidence failed to establish his guilt beyond a reasonable doubt because it was consistent with a casual and uneventful visit to the victim's house, as described by the defendant in his third police interview. We find no merit to this claim.

"[T]he question of identity of a perpetrator of a crime is a question of fact that is within the sole province of the jury to resolve. . . . To determine whether the evidence was sufficient to establish the essential element of identity, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining

the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom, the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . In doing so, we are mindful that the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier [of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Patrick M.*, 344 Conn. 565, 574–75, 280 A.3d 461 (2022).

We conclude that the evidence was sufficient to establish beyond a reasonable doubt that the defendant was the individual who invaded the victim's home and murdered the victim. The Chelsea Piers video clearly depicts an individual, later identified as the defendant, entering the victim's house at the approximate time that the crimes were committed and exiting the house eight minutes later. The video shows no one else arriving at or leaving the victim's home during the relevant time period. The police investigation revealed that all of the doors and windows other than the back door and undisturbed basement window were closed and locked and that there were no signs of entry or egress by different means. The defendant's DNA was found on the fingernails of the victim's wounded left hand, the same hand from which her wedding rings were stolen, and the jury reasonably could have found that the victim's blood was present on the defendant's jeans.[7]

---

[7] We reject the defendant's claim that "[n]o reasonable fact finder could have concluded that the stains were human blood—let alone [the victim's] blood—because no confirmatory testing was conducted to determine if they were actually human blood." Jennifer Green, a forensic science examiner at the state forensic laboratory, testified that there were four, reddish brown stains on the defendant's jeans, all of which tested positive for the presence of blood via the Kastle-Meyer test. The Kastle-Meyer test is an initial screening test that detects the presence of blood, although it cannot distinguish

Additionally, the defendant lied to the police multiple times about his whereabouts on the afternoon of September 25, 2019, his familiarity with the victim, and his presence inside the victim's home. The foregoing evidence is more than sufficient to fulfill the state's burden of establishing the defendant's guilt beyond a reasonable doubt. See, e.g., *State* v. *Honsch*, 349 Conn. 783, 812–16, 322 A.3d 1019 (2024) (consciousness of guilt evidence and direct physical forensic evidence tying defendant to victim's body was sufficient to establish defendant's identity); *State* v. *Abraham*, 343 Conn. 470, 477–79, 274 A.3d 849 (2022) (evidence of defendant's identity was sufficient because defendant's blood was found at scene of shooting, and he was apprehended nearby suffering from recent gunshot wound).

The defendant contends that the evidence adduced at trial was equivocal because it could be construed consistently with a casual visit to the victim's house, as he described in his third interview. This claim carries no force under the present circumstances. "That the jury might have drawn other possible inferences from [the] facts is not sufficient to undermine its verdict, since proof of guilt must be established beyond a reasonable doubt, not beyond a possible doubt. . . . [I]n viewing evidence [that] could yield contrary inferences,

between animal blood and human blood, and may yield a false positive in the presence of an oxidized substance, such as rust. According to Green, there are two ways to verify that the substance tested is indeed human blood—a confirmatory test to detect the presence of human blood, or a DNA test to detect the presence of human DNA. In the present case, the samples derived from the defendant's jeans were insufficient to conduct both tests, so Green elected the second method to ascertain whether two of the stains contained human DNA and, if so, to whom the DNA belonged. The results of the DNA tests revealed that the two, reddish brown stains on the defendant's jeans contained human DNA, which was 100 billion times more likely to belong to the victim than to an unknown individual. See footnote 5 of this opinion. This evidence was sufficient to support a reasonable inference that the substance on the defendant's jeans was human blood belonging to the victim.

the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Otto*, 305 Conn. 51, 74, 43 A.3d 629 (2012). On the basis of the video surveillance footage, the forensic evidence, and the defendant's contradictory statements to the police, it was reasonable and logical for the jury to infer that the defendant was the perpetrator of the crimes of which he was convicted.

## II

The defendant next claims that the trial court improperly declined to give a third-party culpability jury instruction because, in his view, there was forensic evidence directly connecting an unknown male individual to the crimes.

The following additional facts are relevant to this claim. On the last day of evidence, the defendant submitted a request to charge the jury on his third-party culpability defense on the ground that there was unknown male DNA on both the jewelry box located in the victim's bedroom and the likely murder weapon, the hammer found near the victim's body.[8] The trial court

---

[8] The defendant requested the following jury instruction: "There has been evidence that a third party, not the defendant, committed the crime[s] with which the defendant is charged. This evidence is not intended to prove the guilt of the third party but is part of the total evidence for you to consider. The burden remains on the state to prove each and every element of the offense beyond a reasonable doubt.

"It is up to you, and to you alone, to determine whether any of this evidence, if believed, tends to directly connect a third party to the crime[s] with which the defendant is charged. If, after a full and fair consideration and comparison of all the evidence, you have left in your minds a reasonable doubt indicating that the alleged third party, the unknown, male DNA profile discovered on the hammer in [the victim's] basement, may be responsible for the crime[s] the defendant is charged with committing, then it would be your duty to render a verdict of not guilty as to the accused, [the defendant].

"This evidence is not intended to prove the guilt of the third party but is part of the total evidence for you to consider. The burden remains on the

included the requested charge in its first draft of the jury instructions but reconsidered after the prosecutor objected to the instruction at the charge conference. The prosecutor argued that the hammer was a common household object native to the victim's home, the unknown male DNA on its handle could have been deposited at any time, and there was no evidence tying the unknown male DNA to the murder, home invasion, or burglary. The prosecutor pointed out that the time period during which the crimes occurred was very narrow, between 5:15 and 8 p.m. on September 25, 2019, and the evidence was consistent with only one person entering or exiting the victim's residence during that time—the defendant. The trial court sustained the prosecutor's objection, reasoning that there was no evidence indicating that a third party had the opportunity to commit the charged crimes or had unlawfully entered the victim's home, the video surveillance footage depicted the defendant entering and exiting the premises during the relevant time period, the defendant admitted to the police that he was present in the home at that time, and there was DNA evidence implicating the defendant in the crimes. Although the court declined to issue the requested third-party culpability instruction, it informed defense counsel that he was free to argue to the jury "anything that's based in the evidence," such as "the unknown male DNA profile on the hammer . . . ." Consistent with the trial court's ruling, defense counsel argued to the jury in closing that the unknown male DNA profile on the hammer and the jewelry box amounted to reasonable doubt requiring an acquittal.

A trial court's failure to issue a requested third-party culpability jury instruction generally is reviewed for

state to prove each and every element of the offense beyond a reasonable doubt." (Internal quotation marks omitted.) See generally Connecticut Criminal Jury Instructions 2.6-10, available at https://jud.ct.gov/JI/Criminal/Criminal.pdf (last visited July 18, 2025).

abuse of discretion.[9] See, e.g., *State* v. *Ashby*, 336 Conn. 452, 498, 247 A.3d 521 (2020); *State* v. *Schovanec*, 326 Conn. 310, 320–23, 163 A.3d 581 (2017); *State* v. *Jackson*, 304 Conn. 383, 424, 40 A.3d 290 (2012). A defendant is entitled to a third-party culpability jury instruction if the evidence, construed in the light most favorable to supporting the requested charge, demonstrates that there is a "direct connection between a third party and the crime with which the defendant has been charged . . . ." (Internal quotation marks omitted.) *State* v. *Schovanec*, supra, 320; see id., 318–19; see also *State* v. *Arroyo*, 284 Conn. 597, 610, 935 A.2d 975 (2007) ("if the evidence pointing to a third party's culpability, taken together and considered in the light most favorable to the defendant, establishes a direct connection between the third party and the charged offense, rather than merely raising a bare suspicion that another could have committed the crime, a trial court has a duty to submit an appropriate charge to the jury").

Whether a direct connection exists "is necessarily a fact intensive inquiry" that depends on "the context of the entire case . . . ." (Internal quotation marks omitted.) *State* v. *Schovanec*, supra, 326 Conn. 320. A direct connection requires more "than merely tenuous evidence of [third-party] culpability [introduced by a defendant] in an attempt to divert from himself the evidence of guilt." (Internal quotation marks omitted.) Id., 319. Although the evidence of a third party's commission of

---

[9] In his primary brief, the defendant acknowledges that, under our existing case law, the applicable standard of review is abuse of discretion. In his reply brief, however, the defendant urges this court to adopt a more stringent standard of review, arguing that a trial court's refusal to issue a third-party culpability instruction should be reviewed de novo because "the standard for giving a proposed instruction is akin to that in evidentiary insufficiency cases, [in which] de novo review is conducted." We decline to address the defendant's claim because it was raised for the first time in his reply brief. See, e.g., *State* v. *Graham*, 344 Conn. 825, 858, 282 A.3d 435 (2022); *State* v. *Devalda*, 306 Conn. 494, 519 n.26, 50 A.3d 882 (2012).

the crimes "need not exonerate the defendant . . . it must provid[e] a credible, alternative theory as to who committed the crime . . . ." (Internal quotation marks omitted.) *State* v. *Baltas*, 311 Conn. 786, 812, 91 A.3d 384 (2014). For example, we have held that there is a direct connection between a third party and the crimes charged when (1) there is "proof of a third party's physical presence at a crime scene, combined with evidence indicating that the third party would have had the opportunity to commit the crime with which the defendant has been charged," (2) "physical evidence links a third party to a crime scene and there is a lack of similar physical evidence linking the charged defendant to the scene," or (3) there are "statements by a victim that implicate the purported third party, combined with a lack of physical evidence linking the defendant to the crime with which he . . . has been charged . . . ." (Internal quotation marks omitted.) Id., 811–12.

When it comes to forensic evidence recovered from a crime scene, such as fingerprint or DNA evidence, physical proximity on its own normally is insufficient to merit a jury instruction on third-party culpability. See *State* v. *Ashby*, supra, 336 Conn. 503. "[C]ontext, and not proximity alone, is necessary to establish a direct connection between forensic evidence and a third party to the crime." (Emphasis in original.) Id. Compare *State* v. *West*, 274 Conn. 605, 626–27, 877 A.2d 787 (unidentified latent finger and palm prints found at periphery of crime scene lacked direct connection to crimes), cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005), with *State* v. *Cerreta*, 260 Conn. 251, 258–62, 796 A.2d 1176 (2002) (hair and fingerprints found on victim's body and on ligatures used to bind victim's hands and feet had direct connection to crimes). Often, it is unknown and unknowable when the forensic evidence was deposited, but such evidence nonetheless may have a direct connection to the crimes if the nature

and location of that evidence in relation to the other admissible evidence support a reasonable inference that it was left by the perpetrator of the crimes during his commission or flight therefrom. See, e.g., *State* v. *Ashby*, supra, 502–504; *State* v. *Cerreta*, supra, 260–62.

Our decision in *Ashby* is instructive. In that case, we addressed whether a defendant was entitled to a third-party culpability instruction on the basis of three types of forensic evidence found at the scene of the victim's sexual assault and murder: (1) unidentified male DNA from a swab of the victim's vagina, (2) unidentified male saliva from the victim's shoulder, and (3) unidentified male DNA in a bloody handprint on the doorframe of the victim's bedroom.[10] See *State* v. *Ashby*, supra, 336 Conn. 496–97, 503–504. We held that the unidentified male DNA in the saliva and bloody handprint necessitated a third-party culpability instruction; the unidentified male DNA in the victim's vagina, by contrast, did not warrant the instruction, even though it was recovered directly from the victim's body. See id., 503–504. According to the expert testimony adduced at trial, "the unidentified male DNA found on the victim's vaginal swab could have lasted for up to three days," and, "[g]iven this longer timeframe," that evidence, "in and of itself, would have been insufficient to require a third-party culpability instruction as a matter of law." Id. In contrast, the "male DNA on the victim's shoulder . . . would have existed for a more limited duration and was not otherwise explained by the record." Id., 504. "Finally, the unidentified male DNA on the door-

---

[10] See *State* v. *Ashby*, Conn. Supreme Court Briefs & Appendices, April Term, 2019, Defendant's Brief p. 8 ("There were blood pattern stains in the shape of handprints, with fingers outstretched and pointing up, on both sides of the doorframe entering [the victim's] bedroom from the kitchen . . . . DNA results from the bloody handprints on the bedroom doorframe were consistent with a mixture including [the victim] and another male, but [the defendant] was excluded as a contributor." (Citations omitted; footnotes omitted.)).

frame of the victim's bedroom was recovered from a location that was, undisputedly, covered in the victim's blood during the commission of the crimes charged." Id. "Viewing all of the evidence contained in the record in the light most favorable to supporting the proposed charge," we concluded that the jury reasonably could have inferred that the unidentified male DNA found in the saliva on the victim's shoulder and the bloody handprint on the victim's doorframe had been deposited by a third-party perpetrator and that "the trial court abused its discretion by declining to provide such an instruction to the jury." Id., 504–505.

Applying these principles to the facts of this case, we conclude that the trial court did not abuse its discretion by declining to instruct the jury on the defendant's third-party culpability defense.[11] The issue is a close one because the bloody hammer was the likely murder weapon, and the instrumentality of a crime, like the body of a victim, certainly has a close and proximate relationship to the crime.[12] But our precedent clearly

---

[11] This does not mean that the unidentified male DNA improperly was admitted into evidence. Forensic evidence recovered from a crime scene may be admissible for reasons other than establishing that a third party was culpable for the commission of the crimes. For example, such evidence may be relevant and admissible because it is "exculpatory of the defendant"; *State* v. *Cerreta*, supra, 260 Conn. 262; or because it supports a defense of inadequate police investigation, such as the one raised by the defendant. See, e.g., *State* v. *Gomes*, 337 Conn. 826, 853, 256 A.3d 131 (2021) (defendant has "[a] right to rely [on] relevant deficiencies or lapses in the police investigation to raise the specter of reasonable doubt," and jury has "[a] concomitant right to consider any such deficiencies in evaluating whether the state has proved its case beyond a reasonable doubt" (internal quotation marks omitted)). Even if forensic evidence is admitted for the purpose of establishing third-party culpability, a defendant is not entitled to a third-party culpability jury instruction as a matter of right because the totality of "the evidence actually admitted at trial [might fall] short of proving a direct connection." *State* v. *Ashby*, supra, 336 Conn. 503 n.51; see id. (trial court may properly exercise its discretion "to admit forensic evidence demonstrating the presence of a third party at a crime scene" while simultaneously "act[ing] within its discretion by declining to give a third-party culpability instruction").

[12] Unlike the hammer, the unidentified male DNA profile on the jewelry box was "at the periphery of the crime scene" and lacked a "close and

establishes that the connection between the evidence of third-party culpability and the crime charged must rest on grounds beyond mere proximity. When, as here, forensic evidence is offered to supply that connection, its sufficiency must be considered in the context of the entire factual record to determine whether the totality of the circumstances supports a reasonable inference that the evidence at issue was left by the perpetrator of the crimes. In this case, the video surveillance footage, the results of the police investigation, and the quotidian nature of the hammer all lead us to conclude that the totality of the evidence produced at trial was insufficient to permit a reasonable juror to infer that a third party was culpable for the commission of the charged crimes.

Importantly, the time of the victim's death was narrowed down to a short window, between 5:15 and 8 p.m. on September 25, 2019, and there was video surveillance footage that clearly depicted the victim's home during that entire time. The evidence demonstrated that the unlocked screen door and open back door on Willowbrook Avenue was the sole point of entry because all of the other doors and windows were closed, locked, and/or undisturbed. Although the open back door cannot be seen on the video surveillance footage due to the camera angle, the walkway approaching that door is clearly visible, and anyone who arrived at or left the victim's house would have been captured on camera.[13]

direct" relationship to the crimes of conviction. (Internal quotation marks omitted.) *State* v. *Ashby*, supra, 336 Conn. 499. There was no evidence that the perpetrator of the crimes took anything from the victim's jewelry box or entered the bedroom where the jewelry box was located. The murder and theft occurred in the basement of the victim's home, where the victim's body and empty wallet were found. Under these circumstances, the presence of unidentified male DNA on the jewelry box did not warrant a third-party culpability jury instruction.

[13] Similarly, the front door on Cove Road is not visible, but the video surveillance footage clearly depicts the walkway leading up to the front door. The defendant nonetheless contends that this evidence does "not exclude the possibility of someone else entering the home in the . . . two

The defendant was the only person who entered or exited the victim's home that afternoon, entering through the back door at 5:39 p.m., and leaving through the back door at 5:47 p.m.

Additionally, the hammer did not appear to be new, and there was no indication that it was brought to the crime scene by the assailant. It was a common household item, and there was no reason to believe that the assailant was the sole person to have touched the hammer or to have deposited his DNA on its handle. Under these unique factual circumstances, the unknown male DNA profile on the hammer, standing alone, is insufficient to fulfill the defendant's burden of providing a credible, alternative theory that a third party committed the charged crimes. See, e.g., *State* v. *Baltas*, supra, 311 Conn. 812; *State* v. *Hedge*, 297 Conn. 621, 647, 1 A.3d 1051 (2010). The trial court did not err by denying the defendant's request for a third-party culpability jury instruction.

### III

The defendant's final claim is that the prosecutor made two types of improper remarks during closing and rebuttal arguments that deprived the defendant of his due process right to a fair trial. First, the defendant contends that the prosecutor mischaracterized the evidence and urged the jury to draw unreasonable factual

hours and fifteen minutes after [he] left'' because the walkway on Willowbrook Avenue is partially obscured by shrubbery and the clarity of the video declined as night fell. Having reviewed the video surveillance footage, we conclude that it would be highly speculative to infer that a third party could have entered the victim's home through the back or front doors undetected by the Chelsea Piers cameras. See, e.g., *State* v. *Bemer*, 340 Conn. 804, 816, 266 A.3d 116 (2021) (''When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight . . . the inference is less reasonable.'' (Internal quotation marks omitted.)).

inferences from that evidence. Second, the defendant argues that the prosecutor improperly denigrated defense counsel's theory of the case by characterizing it as "deceptive." We conclude that the challenged remarks were not improper.

We apply our familiar two step process to evaluate claims of prosecutorial impropriety. "First, we examine whether an impropriety occurred. . . . If the prosecutor's remarks were improper, then we move on to the second step and examine whether the impropriety deprived the defendant of his constitutional right to a fair trial. . . . [T]he burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." (Citations omitted; internal quotation marks omitted.) *State* v. *Diaz*, 348 Conn. 750, 770, 311 A.3d 714 (2024). In conducting our inquiry, we focus on "the fairness of the trial, and not the culpability of the prosecutor," mindful that "we must view the prosecutor's [remarks] in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 32, 917 A.2d 978 (2007).

A

The defendant claims that the prosecutor mischaracterized the facts in evidence and encouraged the jury to make unreasonable factual inferences by arguing that (1) the victim's DNA was on all four stains on the defendant's jeans, (2) the defendant's DNA was "in" the victim's fingernails, and (3) the victim fought or struggled with the defendant.[14] We reject these claims.

---

[14] The defendant also claims that the prosecutor improperly argued that (1) the blood found on the defendant's jeans was human blood that belonged to the victim, and (2) no one else entered the victim's home after the defendant left. We reject these claims for the reasons explained in part I of this opinion.

"It is not . . . improper for the prosecutor to comment [on] the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . ." (Internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 435, 902 A.2d 636 (2006). The prosecutor is permitted to argue the reasonable inferences the jury may draw from the evidence without being "put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he [or she] is simply saying I submit to you that this is what the evidence shows, or the like." (Internal quotation marks omitted.) *State* v. *Ciullo*, 314 Conn. 28, 41, 100 A.3d 779 (2014). "[W]e must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade [it] to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Internal quotation marks omitted.) *State* v. *Fauci*, supra, 282 Conn. 45–46.

The prosecutor's challenged remarks did not misrepresent the evidence or ask the jury to draw unreasonable factual inferences. With respect to the four, reddish brown stains on the defendant's jeans, there was evidence before the jury that all four stains had tested positive for the presence of blood pursuant to an initial screening test. Further forensic testing was conducted on two of the four stains, revealing that they both contained human DNA that was 100 billion times more likely to belong to the victim than to an unknown individual. See footnote 7 of this opinion. On the basis of this evidence, it was not improper for the prosecutor to argue the reasonable inference that all four stains derived from the same source containing the victim's DNA.[15]

---

[15] To the extent that the prosecutor indiscriminately referred to the bloodstains collectively, thereby implying that all four stains had tested positive for the presence of the victim's DNA, we conclude that the prosecutor's imprecise language did not rise to the level of an impropriety. See, e.g., *State* v. *Harris*, 198 Conn. App. 530, 552–53, 233 A.3d 1197 (prosecutor's

The defendant fares no better with his argument that it was improper for the prosecutor to state that the defendant's DNA was "in" the victim's fingernails because there was no evidence as to precisely where on the victim's fingernails the defendant's DNA was found. Jennifer Green, a forensic science examiner at the state forensic laboratory, testified that a sexual assault collection kit had been used to collect DNA samples from the victim's body. She explained that such collection typically involves "fingernail swabs of the left hand and then of the right hand. [The clinician collecting the samples] would usually swab underneath the fingernails of the individual, like this, and then [the clinician] sometimes will clip the actual fingernails off the individual, as well, and then those [clippings] are put within [an] envelope and then within [the sexual assault collection] kit itself." Likewise, Jacqueline Nunez, the medical examiner who performed the victim's autopsy, testified that a sexual assault kit usually includes "samples from underneath the fingernails" and "clip[pings] [of] the fingernails themselves . . . to preserve DNA, if there is any there." Although Nunez stated that that she did not swab the victim's fingernails prior to clipping them and submitting them for forensic analysis, Green testified that she received both "fingernail swabs and clippings" for forensic analysis from the medical examiner's office. The jury reasonably could have inferred that the fingernail swabs from the victim's left hand came from underneath the victim's fingernails, consistent with the general collection practice.

There also was evidence from which the jury reasonably could have inferred that the defendant's DNA was

---

misstatement as to location of defendant's confession did not constitute prosecutorial impropriety because "[w]hat [was] significant [was] that the admission was made, not where it was made"), cert. denied, 335 Conn. 961, 239 A.3d 1214 (2020); *State* v. *Danovan T.*, 176 Conn. App. 637, 652, 170 A.3d 722 (2017) ("in the heat of argument, counsel may be forgiven for hitting the nail slightly off center but not wholly inventing 'facts' "), cert. denied, 327 Conn. 992, 175 A.3d 1247 (2018).

deposited on the victim's fingernails during a fight or struggle. Stamford police officer Edward Rondano testified that, from the condition of the crime scene, "there appeared to [have been] a fight" between the victim and her assailant. Additionally, DiCarlo testified that the blood patterns at the bottom of the basement stairs led him to conclude that "the victim had struggled either to get up or [to] fight off somebody . . . ." The prosecutor properly relied on this evidence to ask the jurors to use their common sense in determining whether it was more reasonable to believe that the defendant's DNA ended up on the victim's left hand "from a handshake or . . . from a fight . . . ." See, e.g., *State* v. *Courtney G.*, 339 Conn. 328, 347–48, 260 A.3d 1152 (2021) (prosecutor may "appeal to [the jurors'] common sense in closing remarks, so long as the prosecutor's arguments are based on evidence presented at trial and reasonable inferences that jurors might draw therefrom" (internal quotation marks omitted)). Because the prosecutor's comments were rooted in the evidence and the reasonable inferences that could be drawn therefrom, they were not improper.

B

Finally, the defendant claims that the prosecutor improperly characterized defense counsel's theory of the case as "deceptive." The state "acknowledges that, under different circumstances, calling defense counsel's argument 'deceptive' multiple times could constitute impropriety" but argues that it was not improper in this case for two reasons: (1) the prosecutor's rebuttal argument was directly responsive to defense counsel's closing argument, and (2) the prosecutor's comments did not disparage defense counsel or his institutional role in the proceeding. We agree with the state.

The following additional background is pertinent to this claim. During closing argument, defense counsel

described the state's case as "[d]eficient, dismissive, [and] deceptive," arguing that the police had "tunnel vision on [the defendant, which] prevented them from considering how the different facts [that] they [had] developed and [that the state] just presented to you . . . seemingly contradict one another and simply do not fit together. Deceptive. Deficient, dismissive, deceptive." Defense counsel continued with this theme when discussing the defendant's DNA on the victim's fingernails: "Which fingernail did it come from? Don't know. Was it above or below the nail, the DNA? Don't know. Was it from a fingertip or the nail? Don't know. So . . . this is the deceptive part. What sounds 'oh my gosh, wow,' maybe isn't so 'wow' when you look at the science." According to defense counsel, DiCarlo's testimony that the defendant's "DNA was under [the victim's] fingernails . . . was just inaccurate, and ask yourself why. He had the reports, he spoke to the analyst . . . . Why would he make that misrepresentation to you? . . . Again, we just went over the science. Why would he tell you that? Deficient, dismissive, deceptive." In conclusion, defense counsel argued that "[d]eficient, dismissive, and deceptive lead to one more word with a D. You probably know what it is. Doubt. Reasonable doubt. The state must disprove every reasonable hypothesis. If [it] can't based [on] what I've just told you, then you'll need to find the defendant not guilty."

During rebuttal, the prosecutor responded to defense counsel's argument utilizing the same "[d]eficient, dismissive, deceptive" framework. The prosecutor argued that "[t]he defendant's theories are dismissive of the facts in evidence. They are deficient in that they ignore all of the evidence you have, and they are deceptive in saying that this case isn't simple, that it isn't thorough, and that's not to be confused with that it's not serious." Concerning the defendant's DNA on the victim's fingernails, the prosecutor stated that defense counsel "pointed

out that we don't know where that swabbing came from, but we do. That's deceptive. Lana Ramos [a forensic science examiner with the state forensic laboratory who testified at trial] may not have known where it came from because that's not her job. But . . . Nunez, the one who took the swabs, the one who [clipped] the fingernails, she did. She showed you on her own hand where she takes swabs from, and she told you where that was."[16] In sum, the prosecutor argued that defense counsel's theory of defense was "dismissive of the evidence . . . deficient in argument, and . . . deceptive in light of all of the evidence that we have."

It is well established that "[t]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel. . . . There is a distinction [however] between argument that disparages the integrity or role of defense counsel and argument that disparages a theory of defense." (Internal quotation marks omitted.) *State* v. *Dabate*, 351 Conn. 428, 454 n.16, 331 A.3d 1159 (2025). The prosecutor may "forcefully criticize a defense theory on the permissible bases of the evidence and the common sense of the [jurors] . . . ." *State* v. *James*, 141 Conn. App. 124, 150, 60 A.3d 1011, cert. denied, 308 Conn. 932, 64 A.3d 331 (2013). In doing so, the prosecutor must abstain from sarcastic, inflammatory, or vituperative language, but "the limits of legitimate argument and fair comment cannot be determined precisely by rule and line . . . ." (Internal quotation marks

---

[16] The prosecutor appears to have misspoken because Nunez, the medical examiner who performed the victim's autopsy, testified that she did not collect fingernail swabs from the victim, choosing instead to submit only intact fingernail clippings. See part III A of this opinion. Green, the forensic science examiner who prepared the collection kit for DNA analysis in this case, however, testified that she received fingernail swabs and clippings of the victim's left hand from the medical examiner's office and that such swabs "would usually [come from] underneath the fingernails of the individual, *like this* . . . ." (Emphasis added.)

omitted.) *State* v. *Jose R.*, 338 Conn. 375, 387–88, 258 A.3d 50 (2021). To determine whether a prosecutor's challenged remarks were improper in the context of the entire trial, we may consider whether they were made "in direct response to matters raised by defense counsel . . . ." (Internal quotation marks omitted.) *State* v. *Brown*, 256 Conn. 291, 309, 772 A.2d 1107 (2001); see also *Valentine* v. *Commissioner of Correction*, 219 Conn. App. 276, 303, 295 A.3d 973 ("both [this court] and [the Appellate Court] frequently have considered whether a challenged remark of a prosecutor was responsive to a defense theory or argument in determining whether the remark was improper in the first instance"), cert. denied, 348 Conn. 913, 303 A.3d 602 (2023).

Viewing the prosecutor's remarks in context, we conclude that they were not improper. First, the prosecutor did not disparage defense counsel personally or denigrate his institutional role in the proceedings. Instead, the prosecutor criticized defense counsel's theory of the case, contending that his theory was "deficient," "dismissive," and "deceptive" because it did not account for the evidence of the defendant's guilt, particularly the video surveillance footage, the DNA found on the victim's fingernails and the defendant's jeans, and the consciousness of guilt evidence. Second, and significantly in our view, it was defense counsel who first used the "[d]eficient, dismissive, deceptive" framework to critique the state's theory of the case. Having done so, "the defendant has no grounds for complaint" when the prosecutor uses the same exact turn of phrase in response. (Internal quotation marks omitted.) *State* v. *Brown*, supra, 256 Conn. 309; see also *State* v. *Thompson*, 266 Conn. 440, 469, 832 A.2d 626 (2003) (prosecutor's challenged remark was not improper because it "was a reasonable response to one of the primary theories advanced by the defense in the case"); *State* v.

*Singh*, 259 Conn. 693, 716 n.22, 793 A.2d 226 (2002) (prosecutor's challenged "comment was invited by defense counsel's argument and, therefore, was not improper"). We perceive no impropriety.

The judgment is affirmed.

In this opinion the other justices concurred.